J. Kevin West, ISB #3337
HALL, FARLEY, OBERRECHT & BLANTON, P.A.
702 West Idaho, Suite 700
Post Office Box 1271
Boise, Idaho 83701
Telephone: (208) 395-8500
Facsimile: (208) 395-8585

John J. Egbert - 011469
JENNINGS, STROUSS & SALMON, P.L.C.
The Collier Center, 11th Floor
201 East Washington Street
Phoenix, Arizona 85004-2385
Telephone: (602) 262-5911
Facsimile: (602) 495-2615

Attorneys for Defendants Tessenderlo Kerley, Inc., and Steve Sailors

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF IDAHO

| | |
|---|---|
| GARY FENWICK,<br><br>            Plaintiff,<br><br>v.<br><br>TESSENDERLO KERLEY, INC., a Delaware Corporation; STEVE SAILORS, an Individual; and DOES 1 through 50,<br><br>            Defendants. | Case No. CIV 03-384-S-MHW<br><br>**DEFENDANTS' STATEMENT OF FACTS** |

Pursuant to Rule 56, Fed. R. Civ. P. and Rule 7.1, D. Idaho L. Civ. R., Defendants Tessenderlo Kerley, Inc. ("TKI") and Steve Sailors submit the following statement of undisputed facts:

## Plaintiff's Employment History

1. In August of 1999, TKI purchased a chemical plant in Burley, Idaho from Sundance Ag. (Deposition of Gary Fenwick ("Fenwick Depo."), attached to the accompanying Affidavit of J. Kevin West, at p. 8, lines 7-15; and Exhibit 2.)

2. Plaintiff had been working at the Burley Plant as a chemist for Sundance Ag since approximately August 1997. (Fenwick Depo. at p. 8, lines 18-25.)

3. On the day that TKI announced the purchase of the Burley plant to the employees at the plant, TKI's president, Jordan Burns, offered employment to Plaintiff as a chemist. (Fenwick Depo. at p. 17, lines 13-19; p. 21, line 24 to p. 22, line 5; and Exhibit 2.)

4. The offer letter Mr. Burns gave to Plaintiff expressly states that "the terms contained herein are not intended to guarantee a duration of employment." (Fenwick Depo. at Exhibit 2.)

5. When Mr. Burns handed the offer letter to Plaintiff, he told Plaintiff to read it over, and if he liked it, to sign it and give it back. (Fenwick Depo. at p. 17, lines 20-24.)

6. When Plaintiff handed back the signed acceptance of the offer, Mr. Burns stated "Welcome aboard," "we look forward to a good healthy relationship" and "I'm looking forward to a long, good relationship with the company and you." (Fenwick Depo. at p. 18, lines 2-6; p. 23, line 21 to p. 24, line 2; and Exhibit 2.)

7. Shortly after being hired by TKI, Plaintiff received a copy of the employee handbook and read over it. (Fenwick Depo. at p. 25, lines 4-16.)

8. He understood the portion of the handbook that states his employment may be terminated by him or TKI with or without notice at any time, for any reason, and no one at TKI ever told him anything different from that. (Fenwick Depo. at p. 26, line 1 to p. 27, line 5.)

9. TKI transferred Steve Sailors from its manufacturing plant in Coffeyville, Kansas (where he was working as Assistant Plant Manager) to be the Plant Manager at the Burley plant.

Mr. Sailors did not assume the Plant Manager duties until November 8, 1999. (Declaration of Fernando Solano (hereinafter "Solano Decl.") at ¶ 3.)

10. The Burley plant manufactures pesticide. (Fenwick Depo. at p. 42, lines 16-17.)

11. The Burley plant is not in continuous production. Its main production run is from September to perhaps November, and there is also a short, two to four week production run in spring or early summer. (Fenwick Depo. at p. 42, lines 18 to p. 43, line 5.)

12. During the time Plaintiff worked for TKI, the Burley plant had only 12 employees (a plant manager, a secretary, a shipping and receiving officer, a chemist, a mechanic and the rest were operators). (Fenwick Depo. at p. 34, lines 4-8; p. 45, lines 11-15.)

13. Sundance Ag consisted of just the Burley plant; it was not part of a bigger corporate structure. (Fenwick Depo. at p. 60, lines 5-11.)

14. TKI has eleven manufacturing plants throughout the United States and an additional nine non-manufacturing facilities or sales offices internationally. Its corporate headquarters is in Phoenix, Arizona. (Solano Decl. at ¶ 4.)

15. While employed by Sundance Ag, Plaintiff served as safety officer and environmental officer for the Burley plant. (Fenwick Depo. at p. 8, line 23 to p. 9, line 1.)

16. At TKI, the functions Plaintiff had performed as safety officer and environmental officer are performed at the corporate level. None of TKI's manufacturing plants has its own safety or environmental officers. (Fenwick Depo. at p. 40, line 13 to p. 41, line 1; Solano Decl. at ¶ 5.)

17. Shortly after TKI purchased the Burley plant, the safety and environmental officer functions were shifted to TKI's corporate headquarters, consistent with the corporate structure used at TKI's other manufacturing plants. (Fenwick Depo. at p. 36, lines 14-15; p. 38, lines 5-10; p. 60, lines 12-14; Solano Decl. at ¶ 6.)

18. TKI has a chemical lab located at its Sahuarita, Arizona, manufacturing facility which is overseen by its Director of Research and Development, Dr. Michael Hojjatie. This lab supports all of TKI's manufacturing facilities. (Solano Decl. at ¶ 7.)

19. With the exception of the Sahuarita facility (where the corporation's lab is also located), TKI has never employed a chemist at one of its manufacturing plants other than when Plaintiff worked at the Burley plant. Most of the sampling and other chemistry functions Plaintiff performed for TKI at the Burley plant were performed at the other plants by lab technicians (who have substantially less education and are paid substantially less compensation than Plaintiff was). (Solano Decl. at ¶ 8.)

20. At the time TKI purchased the Burley plant, TKI seriously considered whether it made sense to extend an offer to a Ph.D. chemist to work exclusively at that plant. (Solano Decl. at ¶ 9.)

21. TKI ultimately decided to offer employment to Plaintiff in the hope that Plaintiff's educational background and experience might in some way yield additional value to the organization. (Solano Decl. at ¶ 10.)

22. While the Burley plant was in production, Plaintiff analyzed samples every day; during non-production periods, Plaintiff analyzed samples three times a week. (Fenwick Depo. at p. 43, lines 15-22.)

23. When Plaintiff was not analyzing samples, he participated in several safety-related tasks assigned to him and filled the rest of his time with what he describes as "busywork," including doing things "to maintain my professional standing and my professional knowledge and abilities." (Fenwick Depo. at p. 44, line 7 to p. 45, line 10.)

24. TKI did not want Plaintiff to spend his work hours reading professional books and journals or learning new computer software, and instructed Plaintiff not to do so. (Fenwick Depo. at p. 57, lines 6-12; p. 60, lines 15-24.)

25. Plaintiff's job at the Burley plant was not a busy position. (Fenwick Depo. at p. 57, lines 4-6.)

26. Plaintiff had a lot of time on his hands and often sat around waiting for something to do. (Fenwick Depo. at p. 81, lines 2-9; and Exhibit 7 at p. 1.)

27. There were times that Plaintiff would rewrite old company documents on the computer so that it would look like he was busy. (Fenwick Depo. at p. 56, line 25 to p. 57, line 3.)

28. Plaintiff very often asked himself why it was that TKI kept him employed when he did not have very much work to do. (Fenwick Depo. at p. 81, lines 10-13.)

29. Plaintiff does not consider himself to be a team player as an employee. (Fenwick Depo. at p. 53, lines 1-3.)

30. Because the other employees at the Burley plant had a lower level of education, Plaintiff felt they had nothing to offer to him in a friendship. (Fenwick Depo. at p. 182, lines 13-21.)

31. On September 29, 2000, Mr. Sailors sent an email to his supervisor, Jeff Strickland (with a copy to TKI's corporate Director of Manufacturing, Chris Paul; TKI's Group Vice President of Manufacturing and Technical Services, Ken Gagon; and the Corporate Human Resource Director, Fernando Solano), informing them about Plaintiff's performance problems. (Solano Decl. at ¶ 11.)

32. On July 23, 2001, on the same day Mr. Sailors again criticized Plaintiff's lack of teamwork and failure to follow instructions, Mr. Sailors and other TKI senior management personnel began discussing whether TKI really needed a Ph.D. chemist at the Burley plant and whether Plaintiff's position should be added to a list of positions being considered for elimination throughout the company. (Solano Decl. at ¶ 12.)

33. By November of 2001, TKI was discussing possible dates for the termination of Plaintiff's employment in December of 2001 or January 2002. (Solano Decl. at ¶ 13.)

34. When Mr. Sailors told Messrs. Solano, Strickland, Gagon and Paul on January 3, 2002, that he wanted to proceed with the plan to terminate Plaintiff's employment the following week, both Mr. Solano and Mr. Paul suggested that they make sure everything was in order because they were concerned that Plaintiff might attempt to assert an age discrimination claim. They decided that if they were going to terminate Plaintiff's employment for performance issues, it would be better to wait for further documentation supporting the termination decision. (Solano Decl. at ¶ 14.)

35. On February 28, 2002, Mr. Sailors asked Plaintiff why he had stopped attending the Local Emergency Planning Committee meetings held in the local community. Plaintiff responded that he was too busy. Later, after Mr. Sailors gave Plaintiff a disciplinary memorandum for not attending the meetings, Plaintiff claimed that he had not been attending the meetings because Mr. Sailors had instructed him not to attend. (Fenwick Depo. at p. 240, line 22 to p. 241, line 10; and Exhibit 17.)

36. Plaintiff was very upset as a result of receiving the disciplinary memorandum. (Fenwick Depo. at p. 242, lines 13-14.)

37. Plaintiff decided to start "making waves" by sending out a series of emails to senior management, complaining about various practices and actions by Mr. Sailors. (Fenwick Depo. at p. 242, lines 15-25; p. 244, lines 2-20; p. 287, lines 2-21; and Exhibits 18, 26 and 27.)

38. Fernando Solano scheduled a conference call for Wednesday, March 6, 2002, and requested that Plaintiff, Sailors, Strickland, Paul and Mike Morton (Corporate Safety Officer) participate. (Fenwick Depo. at Exhibit 26; Solano Decl. at ¶ 15.)

39. TKI's senior management decided to place Plaintiff on a 60-day probation, and to inform him of this decision during the scheduled conference call. (Solano Decl. at ¶ 16.)

40. Shortly after Mr. Solano began conducting the conference call on March 6, 2002, Plaintiff began making numerous accusations against Mr. Sailors, including claims that Mr.

Sailors had sexually harassed Plaintiff. (Fenwick Depo. at p. 199, line 25 to p. 200, line 4; p. 206, line 5 to p. 207, line 2; and Exhibit 10; Solano Decl. at ¶ 17.)

41. The conference call was the first time that Plaintiff had given any indication that any sexual harassment had occurred. (Fenwick Depo. at p. 112, lines 15-22.)

42. Mr. Solano asked Plaintiff to provide specific details of the alleged harassment (including the conduct, dates, locations and witnesses) that would allow Mr. Solano to investigate the allegations. (Fenwick Depo. at p. 208, lines 5-14.)

43. Plaintiff told Mr. Solano that either Plaintiff or Plaintiff's attorney would supply him the specific details before Plaintiff left on a scheduled medical leave of absence to address his heart problems. (Fenwick Depo. at p. 208, lines 5-10; p. 296, lines 8-19; Solano Decl. at ¶ 18.)

44. Neither Plaintiff nor his attorney provided the specific details to Mr. Solano before Plaintiff began his leave of absence. (Fenwick Depo. at p. 296, lines 20-24.)

45. Plaintiff went on a medical leave of absence in March, 2002, and did not return to work until after May 17, 2002. (Fenwick Depo. at p. 110, lines 2-9; p. 292, line 23 to p. 293, line 3; and Exhibit 30.)

46. After Plaintiff had been back to full-time work for several weeks, Mr. Solano again contacted Plaintiff and asked on several occasions for the specific details that would allow him to investigate the allegations. (Fenwick Depo. at p. 293, lines 4-14; and Exhibit 31.)

47. Finally, by email dated July 12, 2002, Plaintiff told Mr. Solano that he did not want to pursue his sexual harassment allegations any further and that the alleged sexual harassment had stopped since his return from his leave of absence. (Fenwick Depo. at p. 303, lines 3-16; and Exhibit 33.)

48. Plaintiff's attitude and performance improved after his leave of absence and he successfully completed his probation period. (Fenwick Depo. at p. 304, lines 5-13; and Exhibit 34.)

49. As a result of the economic downturn and in an effort to reduce costs and improve profitability, TKI has eliminated 89 positions within its organization in several layoffs over the past four years. (Solano Decl. at ¶ 19.)

50. After once again reviewing company-wide costs and strategic resources, TKI decided to eliminate the chemist position at the Burley plant, effective February 12, 2003. (Solano Decl. at ¶ 20.)

51. On February 12, 2003, TKI notified Plaintiff he was being laid off. (Fenwick Depo. at p. 305, lines 17-23; and Exhibit 35.)

52. TKI offered a severance package to Plaintiff, consistent with its formal severance pay plan (eight weeks plus an additional week because Plaintiff was older than 39 years of age). (Fenwick Depo. at Exhibit 35; Solano Decl. at ¶ 21.)

53. Both the severance pay plan and the notice of termination given to Plaintiff state that the severance offer is contingent on receiving a general release agreement signed by Plaintiff. (Fenwick Depo. at Exhibit 35; Solano Decl. at ¶ 22.)

54. Plaintiff asserted he was entitled to all the severance package, except the one additional, age-related week of benefits, without signing a release. As a result, Plaintiff did not provide a signed release and TKI did not provide any portion of the offered severance benefits. (Fenwick Depo. at p. 189, lines 4-12; p. 306, lines 3-12.)

55. TKI has not hired a new chemist or even a lab technician at the Burley plant to replace Plaintiff after his termination. Instead, TKI installed a new piece of equipment and trained the Operators how to use that equipment to perform the required sample analyses. (Solano Decl. at ¶ 23.)

### Sexual Harassment

56. Plaintiff does not assert a sex discrimination claim; only sexual harassment. (Fenwick Depo. at p. 91, line 24 to p. 92, line 3.)

57. In support of his claim of sexual harassment, Plaintiff alleges (Fenwick Depo. at p. 93, line 24 to p. 104, line 19; p. 303, lines 4-17; and Exhibit 33):

   a. Within a month of Mr. Sailors beginning as plant manager (sometime in late 1999), he "snuggled up" to Plaintiff and asked him "when are you going to shave the beard off for me." (Fenwick Depo. at p. 94, lines 6-22.)

   b. Within a couple weeks later (late 1999 or early 2000), Mr. Sailors commented to Plaintiff "I saw you watching my butt as I walked down the hall." (Fenwick Depo. at p. 96, lines 9-21; p. 98, lines 21-25.)

   c. Mr. Sailors made similar comments three or four other times over a few-week period, shortly after the first comment (during the first half of 2000). (Fenwick Depo. at p. 97, line 23 to p. 98, line 9; p. 99, lines 1-7.)

   d. Sometime in 2000 (or possibly early 2001), while posting something on a bulletin board in close proximity to Plaintiff, Mr. Sailors turned around and said to Plaintiff: "Now don't pat me on the ass." (Fenwick Depo. at p. 99, line 21 to p. 100, line 15.)

   e. Sometime in 2000 or 2001, Mr. Sailors, Plaintiff and other employees were talking and Mr. Sailors commented that his wife was out town, he hates to sleep alone and, while looking at Plaintiff, said "last night I tried to get my son to sleep with me." (Fenwick Depo. at p. 100, line 13 to p. 101, line 8; p. 109, lines 20-23.)

58. Plaintiff did not file a charge of sex harassment with the EEOC or the Idaho Human Rights Commission until April 29, 2003. (Fenwick Depo. at p. 156, line 19 to p. 157, line 4; Solano Decl. at ¶ 24.)

### Family and Medical Leave Act

59. At no time has TKI ever employed 50 or more employees within a 75-mile radius of the Burley plant. (Fenwick Depo. at p. 45, line 11 to p. 46, line 10; Solano Decl. at ¶ 25.)

60. Plaintiff did not use, or attempt to use, FMLA leave while a TKI employee, and was not even aware that a FMLA claim had been asserted on his behalf. (Fenwick Depo. at p. 120, line 19 to p. 121, line 6.)

### Americans with Disabilities Act

61. To support his ADA claim, Plaintiff relies on the physical impairments of diabetes and heart disease. (Fenwick Depo. at p. 121, lines 10-22.)

62. Plaintiff has Type II diabetes; he is not insulin-dependent. Instead, his diabetes is controlled by diet and medication. (Fenwick Depo. at p. 121, line 22 to p. 122, line 17; p. 334, lines 13-23.)

63. Plaintiff's diabetes prevents him from participating in the eating aspects of parties and requires that he take time out periodically to address the symptoms of high or low sugar levels. (Fenwick Depo. at p. 124, line 16 to p. 125, line 11.)

64. Plaintiff's diabetes does not interfere with driving, exercising or living a normal life. (Fenwick Depo. at p. 125, lines 11-13.)

65. Plaintiff's diabetes does not prevent him from being a chemist or doing any other job that does not involve hard, manual labor. (Fenwick Depo. at p. 125, lines 14-17.)

66. Plaintiff's heart disease limits the kinds of exercise in which he can participate and the level of strenuousness. For example, he used to be able to work out on a treadmill for an hour; now the most he can do is twenty minutes. (Fenwick Depo. at p. 125, lines 18-25; p. 156, lines 9-18.)

67. Because of his heart disease, Plaintiff limits his physical labor; he mows his lawn with a rider mower and he takes his cars to the shop rather than work on them himself. (Fenwick Depo. at p. 126, lines 1-9.)

68. Plaintiff's heart disease does not prevent him from working full-time chemist jobs. (Fenwick Depo. at p. 126, lines 13-15.)

69.     Everyone at the Burley plant knew about Plaintiff's diabetes right from the beginning when TKI purchased the plant. (Fenwick Depo. at p. 126, line 23 to p. 127, line 5.)

### Retaliatory Discharge

70.     Plaintiff asserts that the real reasons for the termination of his employment are: (1) to retaliate against him for claiming sexual harassment; (2) disability and age discrimination; (3) pressure from TKI's insurance company to get rid of him because of his poor health; and (4) a personality conflict. (Fenwick Depo. at p. 191, lines 16-25.)

71.     The facts and evidence on which Plaintiff relies to claim that TKI's assertion that his position was eliminated is false are:

    a.      TKI must have hired someone to replace him because the Burley plant could not keep the product within specifications with the existing personnel. (Fenwick Depo. at p. 118, line 11 to p. 119, line 6.)

    b.      The Burley plant had recently completed the construction of a new lab. (Fenwick Depo. at p. 119, lines 7-12.)

    c.      EPA, NESCHAP and DEQ require that the Burley plant have a degreed person to oversee wastewater analysis. (Fenwick Depo. at p. 119, line 13 to p. 120, line 6.)

### Intentional Infliction of Emotional Distress

72.     Plaintiff's claim of intentional infliction of emotional distress against Mr. Sailors is based on the allegations of sexual harassment, discrimination and steadily taking duties away from Plaintiff. (Fenwick Depo. at p. 166, lines 12-21.)

73.     Plaintiff's claim of intentional infliction of emotional distress against TKI is based on the same allegations on which the claim against Mr. Sailors is based as well as: (1) his interactions with Mr. Paul and Mr. Strickland "were not the best;" (2) Mr. Paul was overbearing; and (3) Plaintiff caught Mr. Paul in lies. (Fenwick Depo. at p. 166, line 22 to p. 167, line 12.)

DEFENDANTS' STATEMENT OF FACTS - 11
W:\3\3-334\msj-facts.doc

### Covenant of Good Faith and Fair Dealing

74. The benefits to which Plaintiff believes he was entitled under his employment relationship with TKI, which TKI prevented him from receiving, are:

    a.    advancement in his profession;

    b.    professional recognition; and

    c.    interfacing with safety people.

(Fenwick Depo. at p. 173, lines 17-23.)

75. No one promised these benefits to Plaintiff; he believes they are implied whenever a "professional" is hired. (Fenwick Depo. at p. 173, line 24 to p. 175, line 25.)

### Slander/Libel

76. Plaintiff's slander/libel claim is based on the following alleged statements:

    a.    In early 2000, Mr. Sailors wrote a note to the operators telling them not to follow Plaintiff's instructions anymore because he did not know what he was talking about. (Fenwick Depo. at p. 176, lines 4-10; p. 179, lines 10-17.)

    b.    In the summer of 2000, Mr. Sailors criticized Plaintiff, within the hearing of some of the operators, for not making himself available to help the operators. (Fenwick Depo. at p. 177, lines 9-14; p. 180, line 19 to p. 181, line 2.)

    c.    In March, 2001, during an emergency drill, Mr. Sailors told Plaintiff in front of the operators that "if there was a real emergency, your fat ass would be out the gate and running down the road and I'd be left here alone to handle it." (Fenwick Depo. at p. 176, lines 10-22.)

    d.    Sometime after the summer of 2002, Mr. Sailors wrote in memos to Mr. Paul and Mr. Strickland that Plaintiff did not want to be a team player. (Fenwick Depo. at p. 177, lines 3-5; p. 180, lines 9-18.)

  e. On one occasion when Plaintiff and Mr. Sailors were discussing a problem with the product, Mr. Sailors said: "you don't know what you are talking about." No one else was present. (Fenwick Depo. at p. 181, lines 11-16.)

  f. Plaintiff heard secondhand from an operator, Scott Vail, that Mr. Sailors had stated that Plaintiff was a dumb old fuddy-duddy. (Fenwick Depo. at p. 181, line 20 to p. 182, line 12.)

  77. When asked to produce all memoranda on which Plaintiff's slander/libel claim is based, the memoranda Plaintiff produced say nothing about Plaintiff not wanting to be a team player. (Plaintiff's responses to Interrogatory No. 6, attached to the accompanying Declaration of John J. Egbert.)

  78. Plaintiff does not claim that any prospective employers were aware of the defamatory statements allegedly made by Mr. Sailors. (Fenwick Depo. at p. 186, line 25 to p. 187, line 19.)

### Breach of Contract

  79. Other than the offer letter and Plaintiff's acceptance, Plaintiff did not have a written employment agreement with TKI. (Fenwick Depo. at p. 188, lines 5-9.)

  80. Plaintiff claims TKI breached the employment agreement by: (1) not providing severance pay upon termination; and (2) not complying with the covenant of good faith and fair dealing. (Fenwick Depo. at p. 188, line 10 to p. 189, line 3.)

### False Light

  81. Plaintiff claims that the false information TKI and Mr. Sailors published about him which are the basis for his false light claim are: (1) statements Mr. Sailors wrote in a passdown journal to the operators that Plaintiff did not know what he was talking about; and (2) memorandum that Mr. Sailors sent to Messrs. Paul, Strickland and Solano. (Fenwick Depo. at p. 189, line 16 to p. 190, line 10.)

### Public Disclosure of Private Facts

82. Plaintiff bases his public disclosure of private facts claim on his belief that Mr. Sailors disclosed to the operators at the Burley plant health facts from a questionnaire he filled out that was to be sent to an insurance company. (Fenwick Depo. at p. 190, line 11 to p. 191, line 5; p. 192, line 1 to p. 193, line 21.)

83. Plaintiff has no facts or evidence that Mr. Sailors published the information; he was told that Mr. Sailors and Mr. Morton were the only ones at TKI that had access to the information. (Fenwick Depo. at p. 193, lines 2-15.)

### Intrusion Upon Seclusion

84. Plaintiff bases his claim of intrusion upon seclusion on allegations that TKI and Mr. Sailors threw away his intellectual documents; destroyed his software; refused to give him a place to keep private papers under lock and key; refused to give him an office; and refused to give him a computer to which others did not have access. (Fenwick Depo. at p. 194, lines 7-25.)

### Negligence

85. Plaintiff claims TKI and Mr. Sailors was negligent by: (1) failing to respond when Plaintiff talked to upper management; (2) failing to investigate safety and environmental issues; (3) failing to investigate allegations of sex harassment; and (4) failing to investigate when he complained about the health of his eyes in the lab. (Fenwick Depo. at p. 196, line 22 to p. 198, line 23.)

\
\
\
\
\

DATED this 28 day of July, 2004.

        JENNINGS, STROUSS & SALMON, P.L.C.

        HALL, FARLEY, OBERRECHT
        & BLANTON, P.A.

        By /s/ J. Kevin West
        J. Kevin West - Of the Firm
        Attorneys for Defendants Tessenderlo Kerley,
        Inc., and Steve Sailors

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 28 day of July, 2004, I caused to be served a true copy of the foregoing DEFENDANTS' STATEMENT OF FACTS, by the method indicated below, and addressed to each of the following:

| | |
|---|---|
| Harry C. DeHaan<br>Attorney at Law<br>335 Blue Lakes Blvd. N.<br>Twin Falls, ID 83301 | ✓ U.S. Mail, Postage Prepaid<br>___ Hand Delivered<br>___ Overnight Mail<br>___ Telecopy |

        /s/ J. Kevin West
        J. Kevin West